**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JESSIE GONZALEZ, derivatively on behalf of MICRON TECHNOLOGY, INC., | C.A. No. _____ |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| SANJAY MEHROTRA, DAVID A. ZINSNER, ROBERT L. BAILEY, RICHARD M. BEYER, PATRICK J. BYRNE, MERCEDES JOHNSON, ERNEST E. MADDOCK, LAURENCE N. MONDRY, AND ROBERT E. SWITZ | |
| Defendants, | |
| and | |
| MICRON TECHNOLOGY, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Jessie Gonzalez ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Micron Technology, Inc. ("Micron" or the "Company") files this Verified Shareholder Derivative Complaint against Individual Defendants Sanjay Mehrotra, David A. Zinsner, Robert L. Bailey, Richard M. Beyer, Patrick J. Byrne, Mercedes Johnson, Ernest E. Maddock, Laurence N. Mondry, and Robert E. Switz (collectively, the "Individual Defendants," and together with Micron, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Micron, unjust enrichment, waste of corporate assets, and violations of Sections

1

14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Micron, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Micron's directors and officers from at least September 26, 2017 through the present (the "Relevant Period").

2.      Micron is a holding company for subsidiaries engaged in the production, design, and manufacture of semiconductors and memory and storage products. The Company purports to be an industry leader in innovative memory and storage solutions. Micron maintains a portfolio of "high-performance memory and storage technologies, including [Dynamic random-access memory]" chips or "DRAM." DRAM chips are heavily used in smartphones, computers, and other widely used digital electronics.

3.      The Company manufactures products at facilities located worldwide and purports to face "intense competition" in the semiconductor memory and storage markets. It also sells its products to a global market, with a large percentage of its semiconductor sales attributed to China.

The Company maintained that its competitors included Samsung Electronics and SK Hynix. However, unbeknownst to investors and the public, during the Relevant Period, Micron had been engaging in price-fixing with Samsung Electronics and SK Hynix, which artificially restricted the supply growth of DRAM (the "Anti-Competitive Misconduct").

4.      On April 27, 2018, an antitrust class action alleging violations of several antitrust and consumer protection laws was filed against the Company, Samsung Electronics, and SK Hynix in the United States District Court for the Northern District of California.

5.      In May 2018, the China State Administration for Market Regulation ("CSAMR") began investigating Micron for anti-competitive behavior.[1]

6.      On November 19, 2018, a report published by the Financial Times revealed that Chinese investigators found "massive evidence of anti-competitive behavior." Following the publication on the CSAMR investigation, the Company's stock price fell $2.61 from closing at $39.44 per share the previous trading day, November 16, 2018, to close at $36.83 per share.

7.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in the Anti-Competitive Misconduct.

8.      During the Relevant Period, the Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive

---

[1]      https://www.bloomberg.com/news/articles/2018-06-01/micron-says-being-investigated-by-chinese-regulatory-agents. Last visited February 11, 2019.

Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

10.    During the Relevant Period, the Individual Defendants additionally breached their fiduciary duties by causing the Company to fail to maintain internal controls.

11.    Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while five of them engaged in insider sales, netting proceeds of over $10.7 million.

12.    Approximately 51.6 million shares of the Company's common stock were repurchased at inflated prices between December 1, 2017 and November 29, 2018[2] for over $2.2 billion.

13.    As the Company's stock was actually only worth $36.12 per share, the price at which it was trading on November 20, 2018, the Company overpaid approximately $368.5 million in total.

---

[2] Upon information and belief, at least some of the repurchases between November 2, 2018 and November 29, 2018 were made while the price of the Company's shares was artificially inflated due to the false and misleading statements discussed herein.

14.     The Individual Defendants further breached their fiduciary duties by causing themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

15.     As a result of the Individual Defendants' misconduct, which has subjected Micron, its President and Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in two federal securities fraud class action lawsuits filed in the United States District Court for the Southern District of New York (the "Securities Class Actions"), to numerous lawsuits lodged against the Company resulting from the Anti-Competitive Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company has and will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in the misconduct, the substantial likelihood of the directors' liability in this derivative action, the CEO's, CFO's, and former CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Micron's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Micron is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Micron common stock. Plaintiff has continuously held Micron common stock at all relevant times.

### Nominal Defendant Micron

23.     Micron is a Delaware corporation with its principal executive offices at 8000 South Federal Way, Boise, Idaho 83716. Micron's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "MU."

### Defendant Mehrotra

24.     Defendant Sanjay Mehrotra ("Mehrotra") has served as a director and as the Company's CEO and President since 2017. Defendant Mehrotra also serves as a member of the Finance Committee. According to the Company's Schedule 14A filed with the SEC on December 6, 2018 (the "2018 Proxy Statement"), as of November 19, 2018, Defendant Mehrotra beneficially owned 449,756 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Mehrotra owned approximately $16.5 million worth of Micron stock.

25.     For the fiscal year ended August 30, 2018, Defendant Mehrotra received $14,241,583 in compensation from the Company. This included $1,200,000 in salary, $7,499,952 in stock awards, $2,500,001 in option awards, $3,000,000 in Non-Equity Incentive Plan Compensation, and $41,630 in all other compensation.

26.     The Company's 2018 Proxy Statement stated the following about Defendant Mehrotra:

> *Sanjay Mehrotra*[3] joined us in May 2017 as our President, Chief Executive Officer, and Director. Mr. Mehrotra co-founded and led SanDisk Corporation as a start-up in 1988 until its eventual sale in May 2016, serving as its President and Chief Executive Officer from January 2011 to May 2016, and as a member of its Board of Directors from July 2010 to May 2016. Mr. Mehrotra served as a member of the Board of Directors for Cavium, Inc. from July 2009 until July 2018 and for Western Digital Corp. from May 2016 to February 2017. Mr. Mehrotra holds a BS and an MS in Electrical Engineering and Computer Science from the University of California, Berkeley and is a graduate of the Stanford Graduate School of Business Executive Program.
>
> Mr. Mehrotra's has 39 years of experience in the semiconductor memory industry. As a co-founder of SanDisk he offers a unique perspective on the industry and has significant senior leadership and technological expertise. He also has expertise in finance, corporate development, corporate governance and business strategy.

---

[3] Emphasis in original unless otherwise noted in this Complaint.

**Defendant Zinsner**

27.     Defendant David A. Zinsner ("Zinsner") has served as Micron's CFO since February 2018. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Zinsner beneficially owned 83,493 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Zinsner owned approximately $3 million worth of Micron stock.

28.     For the fiscal year ended August 30, 2018, Defendant Zinsner received $5,309,764 in compensation from the Company. This included $331,462 in salary, $2,124,998 in stock awards, $2,124,997 in option awards, $493,105 in Non-Equity Incentive Plan Compensation, and $235,202 in all other compensation.

29.     The Company's website stated the following about Defendant Zinsner[4]:

David Zinsner is the senior vice president and chief financial officer at Micron Technology.

Mr. Zinsner joined Micron in February 2018 with more than 20 years of financial and operations experience in the semiconductor and technology industry.

Mr. Zinsner most recently served as president and chief operating officer at Affirmed Networks. Previously, he was senior vice president of finance and CFO at Analog Devices. Prior to that, he was senior vice president and chief financial officer at Intersil Corp.

Mr. Zinsner holds a master's degree in business administration, finance and accounting from Vanderbilt University and a bachelor's degree in industrial management from Carnegie Mellon University.

**Defendant Bailey**

30.     Defendant Robert L. Bailey ("Bailey") has served as a Company director since 2007. He also serves as a member of the Audit Committee and the Governance and Sustainability

---

[4] https://www.micron.com/about/our-company/leadership/david-zinsner. Last visited February 8, 2019.

Committee. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Bailey beneficially owned 102,204 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Bailey owned approximately $3.7 million worth of Micron stock.

31.     For the fiscal year ended August 30, 2018, Defendant Bailey received $373,214 in compensation from the Company. This included $123,231 in fees earned or cash paid and $249,983 in stock awards.

32.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bailey made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 2, 2017 | 3,000 | $  39.86 | $  119,580.00 |
| November 1, 2017 | 3,000 | $  44.55 | $  133,650.00 |
| December 1, 2017 | 3,000 | $  41.50 | $  124,500.00 |
| January 2, 2018 | 3,000 | $  42.84 | $  128,520.00 |
| February 1, 2018 | 3,000 | $  43.14 | $  129,420.00 |
| March 1, 2018 | 3,000 | $  47.98 | $  143,940.00 |
| April 2, 2018 | 3,000 | $  50.74 | $  152,220.00 |
| May 1, 2018 | 3,000 | $  46.47 | $  139,410.00 |
| June 1, 2018 | 3,000 | $  58.38 | $  175,140.00 |

Thus, in total, before the fraud was exposed, he sold 27,000 Company shares on inside information, for which he received approximately $1.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

33.     The Company's 2018 Proxy Statement stated the following about Defendant Bailey:

*Robert L. Bailey* was the interim Chief Executive Officer of Blue Willow Systems, Inc. from August 2017 until August 2018. Blue Willow is a software as a service

resident safety platform for senior living facilities. Mr. Bailey was the Chairman of the Board of Directors of PMC-Sierra, Inc. from 2005 until May 2011 and also served as PMC's Chairman from February 2000 until February 2003. Mr. Bailey served as a director of PMC from October 1996 to May 2011. He also served as the Chief Executive Officer of PMC from July 1997 until May 2008. Within the past five years, Mr. Bailey also served on the Board of Directors of Entropic Communications. Mr. Bailey holds a BS in Electrical Engineering from the University of Bridgeport and an MBA from the University of Dallas.

Mr. Bailey's experience as Chief Executive Officer and Chairman of a leading technology company has given him expertise in the technology industry as well business operations, finance, corporate development, corporate governance and management.

**Defendant Beyer**

34.     Defendant Richard M. Beyer ("Beyer") has served as a Company director since 2013. He also serves as the Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Beyer beneficially owned 80,980 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Beyer owned approximately $2.9 million worth of Micron stock.

35.     For the fiscal year ended August 30, 2018, Defendant Beyer received $375,633 in compensation from the Company. This included $125,650 in fees earned or cash paid and $249,983 in stock awards.

36.     The Company's 2018 Proxy Statement stated the following about Defendant Beyer:

*Richard M. Beyer* was Chairman and Chief Executive Officer of Freescale Semiconductor, Inc. from 2008 through June 2012 and served as a director with Freescale until April 2013. Prior to Freescale, Mr. Beyer was President, Chief Executive Officer and a director of Intersil Corporation from 2002 to 2008. He also has previously served in executive management roles at FVC.com, VLSI Technology, and National Semiconductor Corporation. Within the past five years, Mr. Beyer served on the Board of Directors of Microsemi Corporation, and Analog Devices, Inc. He currently serves as the Chairman of the Board of Directors of Dialog Semiconductor. Mr. Beyer served three years as an officer in the United States Marine Corps. He holds a BS and an MS in Russian from Georgetown

University and an MBA in Marketing and International Business from Columbia University Graduate School of Business. Mr. Beyer is the Chair of the Board of Directors' Governance and Sustainability Committee.

Mr. Beyer's experience as the Chief Executive Officer and a director at leading technology companies has given him expertise in the technology industry as well business operations, finance, corporate development, corporate governance and management.

**Defendant Byrne**

37.     Defendant Patrick J. Byrne ("Byrne") has served as a Company director since 2011. He also serves as a member of the Compensation Committee and the Audit Committee. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Byrne beneficially owned 121,003 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Byrne owned approximately $4.4 million worth of Micron stock.

38.     For the fiscal year ended August 30, 2018, Defendant Byrne received $373,214 in compensation from the Company. This included $123,231 in fees earned or cash paid and $249,983 in stock awards.

39.     In addition, Defendant Byrne is the President of Tektronix, a subsidiary of Fortive Corporation, which the Company paid $2,670,000 during the fiscal year ended August 30, 2018 through November 19, 2018 for various equipment and maintenance purchases.

40.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Byrne made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 2, 2018 | 14,360 | $  46.31 | $   665,011.60 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

41.     The Company's 2018 Proxy Statement stated the following about Defendant Byrne:

*Patrick J. Byrne* has served as Senior Vice President of Fortive Corporation since July 2016, when Danaher Corporation completed the separation of its Test & Measurement and Industrial Technologies segments, and as President of Tektronix, now a subsidiary of Fortive Corporation, since July 2014. Previously, he was Vice President of Strategy and Business Development and Chief Technical Officer of Danaher from November 2012 to July 2014. Danaher designs, manufactures, and markets innovative products and services to professional, medical, industrial, and commercial customers. Mr. Byrne served as Director, President and Chief Executive Officer of Intermec, Inc. from 2007 to May 2012. Within the past five years, Mr. Byrne served on the Board of Directors of Flow International. Mr. Byrne holds a BS in Electrical Engineering from the University of California, Berkeley and an MS in Electrical Engineering from Stanford University.

Mr. Byrne's experience in executive management at public companies has given him expertise in the technology industry as well as business operations, finance, corporate development, corporate governance and management.

**Defendant Johnson**

42.     Defendant Mercedes Johnson ("Johnson") served as a Company director from 2005 until her retirement in January 2019. She also served as Chair of the Audit Committee and Finance Committee. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Johnson beneficially owned 41,453 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Johnson owned approximately $1.5 million worth of Micron stock.

43.     For the fiscal year ended August 30, 2018, Defendant Johnson received $427,602 in compensation from the Company. This included $177,619 in fees earned or cash paid and $249,983 in stock awards.

44.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Johnson made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| April 2, 2018 | 25,000 | $  50.50 | $   1,262,500 |

Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

45.     The Company's Schedule 14A filed with the SEC on December 7, 2017 (the "2017 Proxy Statement") stated the following about Defendant Johnson:

> *Mercedes Johnson* was the Senior Vice President and Chief Financial Officer of Avago Technologies Limited, a supplier of analog interface components for communications, industrial, and consumer applications, from December 2005 to August 2008. She also served as the Senior Vice President, Finance of Lam Research Corporation from June 2004 to January 2005 and as Lam's Chief Financial Officer from May 1997 to May 2004. Ms. Johnson holds a degree in Accounting from the University of Buenos Aires and currently serves on the Board of Directors for Juniper Networks, Inc., Teradyne, Inc., and Synopsys, Inc. She also served on the Board of Directors for Intersil Corporation from August 2005 to February 2017. Ms. Johnson is the Chair of the Board of Directors' Audit Committee and Finance Committee.
>
> Ms. Johnson's experience as the Chief Financial Officer of several technology companies has given her expertise in finance, corporate development, corporate governance, management and operations.

**Defendant Maddock**

46.     Defendant Ernest E. Maddock ("Maddock") served as the Company's CFO from June 2015 to February 2018. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Maddock beneficially owned 206,552 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Maddock owned approximately $7.6 million worth of Micron stock.

47.   For the fiscal year ended August 30, 2018, Defendant Maddock received $5,278,197 in compensation from the Company. This included $491,231 in salary, $2,723,360 in stock awards, $865,446 in option awards, $960,000 in Non-Equity Incentive Plan Compensation, and $238,160 in all other compensation.

**Defendant Mondry**

48.   Defendant Lawrence N. Mondry ("Mondry") served as a Company director from 2005 until his retirement in January 2019. He also served as Chair of the Compensation Committee and the Governance and Sustainability Committee. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Mondry beneficially owned 139,287 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Mondry owned approximately $5.1 million worth of Micron stock.

49.   For the fiscal year ended August 30, 2018, Defendant Mondry received $419,253 in compensation from the Company. This included $169,270 in fees earned or cash paid and $249,983 in stock awards.

50.   During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mondry made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 14, 2018 | 50,000 | $ 43.47 | $  2,173,500 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

51.     The Company's 2017 Proxy Statement stated the following about Defendant Mondry:

> *Lawrence N. Mondry* has been the President and Chief Executive Officer of Stream Gas & Electric, Ltd., a provider of energy, mobile and protective services, since February 2016. Mr. Mondry was the Chief Executive Officer of Apollo Brands, a consumer products portfolio company, from February 2014 to February 2015. Mr. Mondry was the Chief Executive Officer of Flexi Compras Corporation, a rent-to-own retailer, from June 2013 to February 2014. Mr. Mondry was the President and Chief Executive Officer of CSK Auto Corporation, a specialty retailer of automotive aftermarket parts, from August 2007 to July 2008. Prior to his appointment at CSK, Mr. Mondry served as the Chief Executive Officer of CompUSA Inc. from November 2003 to May 2006. Mr. Mondry is the Chair of the Board of Directors' Compensation Committee and Governance and Sustainability Committee.
>
> Mr. Mondry's experience as the Chief Executive Officer of various retailers has given him expertise in operations, management, finance and corporate development. Mr. Mondry's retail expertise is especially relevant to our Crucial business.

## Defendant Switz

52.     Defendant Robert E. Switz ("Switz") has served as a Company director since 2006. He also serves as Chairman of the Board and a member of the Compensation Committee and the Governance and Sustainability Committee. According to the 2018 Proxy Statement, as of November 19, 2018, Defendant Switz beneficially owned 51,162 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on November 19, 2018 was $36.83, Defendant Switz owned approximately $1.8 million worth of Micron stock.

53.     For the fiscal year ended August 30, 2018, Defendant Switz received $526,090 in compensation from the Company. This included $276,107 in fees earned or cash paid and $249,983 in stock awards.

54.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Switz made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| July 2, 2018 | 75,000 | $   53.00 | $   3,975,000.00 |
| July 13, 2018 | 25,000 | $   56.00 | $   1,400,000.00 |

Thus, in total, before the fraud was exposed, he sold 100,000 Company shares on inside information, for which he received approximately $5.3 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

55.     The Company's 2018 Proxy Statement stated the following about Defendant Switz:

*Robert E. Switz* was the Chairman, President, and Chief Executive Officer of ADC Telecommunications, Inc., a supplier of network infrastructure products and services, from August 2003 until December 2010, when Tyco Electronics Ltd. acquired ADC. Mr. Switz joined ADC in 1994 and throughout his career there held numerous leadership positions. Within the past five years, Mr. Switz served on the Board of Directors of GT Advanced Technologies Inc., Broadcom Corporation, Cyan, Inc., Pulse Electronics Corporation, Leap Wireless International, Inc., and Gigamon, Inc. Mr. Switz currently serves on the Board of Directors for Marvell Technology Group Ltd. and FireEye, Inc. Mr. Switz holds an MBA from the University of Bridgeport and a BS in Business Administration from Quinnipiac University. Mr. Switz was appointed Chairman of the Board of Directors in 2012.

Mr. Switz's experience as Chief Executive Officer and Chairman of a leading technology company has given him expertise in the technology industry as well business operations, finance, corporate development, corporate governance and management.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers and/or directors and fiduciaries of Micron and because of their ability to control the business and corporate affairs of Micron, the Individual Defendants owed Micron and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Micron in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Micron and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to Micron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Micron, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Micron, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised Micron's Board at all relevant times.

61.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC including all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

62.     To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Micron were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Idaho, and the United States, and pursuant to Micron's own Code of Business Conduct and Ethics;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Micron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Micron and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Micron's operations would comply with all applicable laws and Micron's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to Micron and the shareholders the duty of loyalty requiring that each favor Micron's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Micron and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, and directorial positions with Micron, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Micron.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Micron, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Micron and was at all times acting within the course and scope of such agency.

## MICRON'S CODE OF CONDUCT

72.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), states that: "This Code applies to everyone who works on Micron's behalf worldwide, including

team members (employees, officers and directors), temporary workers, vendors, suppliers and

contractors. We are all expected to adhere to the standards contained in this Code."

73.    The Code of Conduct provides, under the section titled, "Fair Conduct in the

Marketplace" that the Company "never" participates in anticompetitive behaviors and complies

fully with laws promoting fair competition, stating in relevant part:

> We strive to provide customers with a wide selection of goods at fair prices. To do
> this, we comply fully with fair competition laws of the U.S. and other countries
> where we do business. Fair competition laws ensure that businesses in the
> marketplace compete on the basis of quality and integrity—never by participating
> in unfair and anticompetitive practices such as price fixing, market, customer or
> supplier allocation, tying and bundling or any other agreement that would unfairly
> limit competition. Even if no written or oral agreement to violate these laws exists,
> an illegal agreement may still be inferred from our behavior. It is unacceptable to
> make agreements with our competitors to improperly restrain trade—or give the
> appearance that we have done so. To avoid even the appearance of impropriety, we
> should generally avoid discussing any of the following topics with our competitors:
>
>   • Pricing, credit terms or conditions of sale of products
>   • Plans regarding customers
>   • Pricing policies, bidding plans or strategies
>   • Marketing plans • Restricting output, such as production volumes
>   • Discounts and promotions
>   • Dividing markets, territories (such as sales territories) or customers
>   • Inventories and capacity
>   • Whether or how to deal with a customer or supplier

74.    The Code of Conduct provides that the Company engages in honest, fair, and

accurate sales practices:

> Micron's reputation is one of our most important assets. To protect the trust
> customers place in us, our marketing and sales activities must always be fair, honest
> and accurate. When we make a claim about a product, it must be true and we must
> be able to prove it. It is very important that we adhere to applicable advertising laws
> and regulations at all times by following the Company's internal procedures.

75.    The Code of Conduct provides that the Company has a duty to accurately

record and report data to shareholders and regulators, stating specifically:

> The information we record helps our Company plan for the future. It also informs
> the financial data we report to shareholders and regulators. To make sure our

Company can plan correctly and that our shareholders and regulators have accurate information, our books and records—whether paper or electronic—must always be complete and honest. They must fairly reflect our business assets, liabilities, expenses and revenue. We all have a duty to maintain our books and records in accordance with accounting principles generally accepted in the United States and any other regulatory requirements that apply to a multinational, publicly traded company.

76.     In a section titled, "Records management," the Code of Conduct provides that in addition to creating honest and accurate financial records, the Company is also committed to detecting and preventing any type of fraud such as certain misstatements, stating in relevant part:

We are also firmly committed to preventing and detecting any act of fraud. Generally speaking, fraud is intentionally concealing facts in order to deceive or mislead others. Among other things, this may include:

• Misstatements due to fraudulent financial reporting or revenue recognition

•Misstatements related to using assets for illegal, inappropriate or unintended purposes (such as wire fraud or fictitious vendors)

• Fraudulently obtained revenue and assets

• Attempts to avoid costs and expenses If you think unethical, improper or illegal conduct is taking place—particularly concerning our internal accounting practices, financial irregularities or fraud—you must report your concerns immediately.

77.     The Code of Conduct provides that "insider trading is taken very seriously" and outlines that:

Trading on material, non-public information violates insider trading laws. Anyone involved in insider trading could be subject to disciplinary action, as well as potential civil or criminal penalties. It is also illegal to provide inside information to others (or tip them) to influence their investment decisions. Insider trading is taken very seriously. You may face penalties for misusing inside information even if the amount of money involved was small—or even if you made no profit at all. If you share inside information with other Micron team members as part of your job, you must know and follow the procedures in place for releasing such information. If you receive inside information that you should not possess, report it immediately to the Legal Department.

78.     The Individual Defendants violated the Code of Conduct by causing the Company to engage in the Anti-Competitive Misconduct in violation of applicable U.S. and Chinese laws, and scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.     Micron is a global semiconductor and memory chip business which specializes in the manufacture and sale of memory and storage products like DRAM. DRAM products are heavily used in computers, televisions, cameras, tablets, and smartphones, and are comprised of silicon wafers. Due to the essentiality of DRAM chips in widely used digital electronics, any price fluctuation in DRAM will affect the overall prices of such products as well.

80.     The Company purportedly faced fierce competition with other manufacturing companies including Samsung Electronics Co., Ltd. And SK Hynix Inc., which, collectively with Micron, are industry leaders in the global DRAM market.

81.     There are a number of antitrust and consumer protection laws both within the United States and China which prohibit certain anti-competitive behaviors such as price-fixing. Price-fixing is an agreement between competitors to adjust their own prices in relation to their competition to achieve a type of restriction on competition, often times leading to higher costs paid by consumers. For example, two competitors agree to establish a minimum, maximum, or stabilized price on a particular product, this agreement can allow a type of market control by the competitors that would take away certain market characteristics often found in a competitive

supply and demand market. In addition, certain types of anti-competitive behaviors may result in market monopoly.

**The Anti-Competitive Misconduct**

82.     During the Relevant Period, the Company engaged in price-fixing with South Korea's Samsung Electronics ("Samsung") and SK Hynix ("Hynix"). Although the price of DRAM had been gradually falling for the past thirty years, in 2017, the price of DRAM rose 47%, making the largest jump in DRAM price since 1978.[5]

83.     On April 27, 2018, a class action lawsuit was filed against Micron, Samsung, and Hynix in the United States District Court for the Northern District of California, captioned: *Jones et al v. Micron Technology Inc. et al*, Case No: 3:18-cv-02518. The class action alleged violations of certain antitrust laws including the Sherman Act, the Cartwright Act, California's Unfair Competition Law, and State Antitrust and Restraint of Trade Laws.

84.     On May 15, 2018, Chinese authorities began investigating Micron, Samsung, and Hynix for possible collusion. On May 31, 2018, CSAMR made an unannounced visit to the Company's offices in Beijing, Shanghai, and Shenzai to investigate. Meanwhile, the Company continued to tout its competition. The Company did not disclose the ongoing investigations until October 15, 2018 in its annual report filed with the SEC on a Form 10-K. While Micron announced that these investigations were ongoing and that the Company was cooperating with them, it failed to mention that it was engaged in the Anti-Competitive Misconduct and that Chinese investigators found "massive evidence of anticompetitive behavior."

---

[5]   http://www.icinsights.com/news/bulletins/Are-The-Major-DRAM-Suppliers-Stunting-DRAM-Demand/. Last visited February 11, 2019.

85.     On November 19, 2018, an article published by the Financial Times revealed that CSAMR had made "important progress" in the anti-monopoly probe it was conducting on the Company. The investigation had yielded "massive evidence" that Micron had engaged in anti-competitive behavior. When news outlets reported that the Chinese authorities had found evidence of Micron's engagement in anti-competitive activities, the Company's stock price dropped $2.61, close to 7%, from closing at $39.44 per share on the previous trading day, November 16, 2018, to close at $36.83 per share on November 19, 2018.

86.     The Individual Defendants caused the Company to engage in the Anti-Competitive Misconduct, which exposed the Company, *inter alia*, to the risk of heavy fines in Beijing and caused a decline in the value of the Company.

**False and Misleading Statements**

***September 26, 2017 Press Release***

87.     On September 26, 2017, the Company issued a press release announcing its financial results for the fourth quarter and year ended August 31, 2017. The Company reported revenues of $20.32 billion and GAAP net income of $5.09 billion.

***October 26, 2017 Form 10-K***

88.     On October 26, 2017, the Company filed with the SEC its annual report for the fiscal year ended August 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Individual Defendants Mehrotra, Maddock, Bailey, Beyer, Byrne, Johnson, Mondry, and Switz.

89.     The 2017 10-K detailed under "Risk Factors" that Micron faced intense competition in the semiconductor and storage markets—particularly from Samsung and Hynix; it stated in pertinent part:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology their products could have cost or performance advantages. The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

90.     Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Mehrotra and Maddock attesting to the accuracy of the 2017 10-K.

***December 7, 2017 Proxy Statement***

91.     The Company filed its 2017 Proxy Statement with the SEC on December 7, 2017. Defendants Bailey, Beyer, Byrne, Johnson, Mehrotra, Mondry, and Switz solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.

92.     The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board of Directors has adopted a Code of Business Conduct and Ethics that is applicable to all our directors, officers and employees."

93.     The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

94.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "promote [the Company's] long-term success and shareholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

95.     The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

***December 19, 2017 Press Release***

---

Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

96.    On December 19, 2017, the Company issued a press release announcing its financial results for its first quarter ended November 30, 2017. The Company reported revenues of $6.80 billion and GAAP net income of $2.68 billion.

### March 22, 2018 Press Release

97.    On March 22, 2018, the Company issued a press release announcing its financial results for its second quarter ended March 1, 2018. The Company reported revenues of $7.35 billion and GAAP net income of $3.31 billion.

### June 20, 2018 Press Release

98.    On June 20, 2018, the Company issued a press release announcing its financial results for the third quarter ended May 31, 2018. The Company reported revenues of $7.80 billion and GAAP net income of $3.82 billion.

### June 22, 2018 Form 10-Q

99.    On June 22, 2018, the Company filed its quarterly report on a Form 10-Q for the period ended March 31, 2018, which was signed by Defendant Zinsner.  Attached to the 10-Q were SOX certifications signed by Defendants Mehrotra and Zinsner attesting to the accuracy of the 10-Q.

100.   The 10-Q noted the antitrust class action lawsuit filed against the Company in April of 2018 and mentioned that the resolution of the lawsuit and others like it could result in "significant liability," stating in relevant part:

> On April 27, 2018, a purported class-action lawsuit was filed against Micron and other DRAM suppliers in the U.S. District Court for the Northern District of California asserting claims based on alleged price-fixing of DRAM products during the period from June 1, 2016 to February 1, 2018. Similar cases were subsequently filed in Canadian courts in Quebec, Montreal and Toronto, Ontario. The complaints seek treble monetary damages, costs, interest, attorneys' fees, and other injunctive and equitable relief. We are unable to predict the outcome of these matters and therefore cannot estimate the range of possible loss. The final resolution of these

matters could result in significant liability and could have a material adverse effect on our business, results of operations, or financial condition.

101.    The 10-Q also repeated the Company's prior risk disclosures regarding the

intense competition it faced with Samsung, Hynix, and other companies:

> We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. The activities by the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

> Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

**September 20, 2018 Press Release**

102.   On September 20, 2018, the Company issued a press release announcing its financial results for its fourth quarter and full year ended August 30, 2018. The Company reported revenues of 30.39 billion and GAAP net income of $14.14 billion.

### October 15, 2018 Form 10-K

103.   On October 15, 2018, the Company filed with the SEC its annual report for the fiscal year ended August 30, 2018 on a Form 10-K (the "2018 10-K"), which was signed by Individual Defendants Mehrotra, Zinsner, Bailey, Beyer, Byrne, Johnson, Mondry, and Switz.

104.   The 2018 10-K reiterated the competition the Company faced under its "Risk Factors" section, detailing the competitive nature of the industry and material risks the Company would be exposed to if its competitors were more successful, stating in pertinent part:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. In addition, the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in

future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.

105.    The 2018 10-K also reported the class action lawsuit regarding certain antitrust matters which had been filed against the Company in April 2018, and noted the regulatory investigations being done by CSAMR, which the Company had been notified of almost six months prior to its disclosure, stating in pertinent part:

On April 27, 2018, a purported class-action lawsuit was filed against Micron and other DRAM suppliers in the U.S. District Court for the Northern District of California asserting claims based on alleged price-fixing of DRAM products during the period from June 1, 2016 to February 1, 2018. Similar cases were subsequently filed in federal court in the United States, as well as in Canadian courts in Quebec, Montreal and Toronto, Ontario. The complaints seek treble monetary damages, costs, interest, attorneys' fees, and other injunctive and equitable relief. We are unable to predict the outcome of these matters and therefore cannot estimate the range of possible loss. The final resolution of these matters could result in significant liability and could have a material adverse effect on our business, results of operations, or financial condition.

On May 15, 2018, the Chinese State Administration for Market Regulation ("SAMR") notified Micron that it was investigating potential collusion among DRAM suppliers in China. On May 31, 2018, SAMR made unannounced visits to our sales offices in Beijing, Shanghai, and Shenzhen to seek certain information as part of its investigation. We are cooperating with SAMR in its investigation.

106.    Attached to the 2018 10-K were SOX certifications signed by Defendants Mehrotra and Zinsner attesting to the accuracy of the 2018 10-K.

**December 6, 2018 Proxy Statement**

107.    The Company filed its 2018 Proxy Statement with the SEC on December 6, 2018.

Defendants Bailey, Beyer, Byrne, Johnson, Mehrotra, Mondry, and Switz solicited the 2018 Proxy

Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.[7]

108.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that,

"[t]he Board of Directors has adopted a Code of Business Conduct and Ethics that is applicable to

all our directors, officers and employees."

109.    The 2018 Proxy Statement was false and misleading because, despite assertions to

the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and

misleading statements alleged herein, the insider trading engaged in by five of the Individual

Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

110.    The Individual Defendants also caused the 2018 Proxy Statement to be false and

misleading with regard to executive compensation in that they purported to employ "pay-for-

performance" elements, including equity awards designed to "promote [the Company's] long-term

success and shareholder value" while failing to disclose that the Company's share price was

artificially inflated as a result of false and misleading statements alleged herein.

111.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company

engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely

result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the

Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

performance were inflated; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

112.   The statements in ¶¶ 87-90 and 96-106 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

113.   On November 19, 2018, an article published by the Financial Times titled "China alleges 'massive' evidence of chipmaker violations" revealed that Chinese authorities investigating Micron, Samsung, and Hynix for potential collusion related to price-fixing had found "massive evidence of anti-competitive behavior." The article stated that the probe had made "important progress" stating, "Chinese investigators said they found 'massive evidence' of anti-competitive behavior by the world's top three makers of computer memory chips, in a probe that could exacerbate global trade tensions." The article quoted the head of China's anti-Monopoly bureau under the State Administration for Market Regulation, Wu Zhenguo, who stated, "'The anti-monopoly investigation into these three companies has made important progress . . . [It] has

yielded massive evidence[.]'" The article outlined relevant background information on the companies, including prior charges of price-fixing:

> The three companies control as much as 95 per cent of the global market for dynamic random-access memory (DRAM) chips, which are widely used in computers and smartphones.
>
> After steadily falling for most of the past three decades, the price-per-bit of DRAM chips rose 47 per cent in 2017, according to the US research firm IC Insights, and has continued to increase this year. The Chinese investigation follows a class-action lawsuit in the US, lodged in April, which alleges that the three companies conspired to inflate DRAM prices. The companies are contesting the case.
>
> &ast; &ast; &ast;
>
> In 2005, Samsung and Hynix paid out $300m and $185m to settle price-fixing charges from the US Justice department. The two companies, and seven others, were hit with fines totalling €331m from the EU commission in 2010 for price fixing between 1998 and 2002.

114.    The article additionally outlined the ramifications that could result from engaging in price-fixing, such as the imposition of heavy fines, stating "Kim Young-woo, an analyst at SK Securities, said Beijing could impose fines of more than $2.5bn on each of the three chipmakers in the worst-case scenario if they are found to have fixed prices." Mr. Young, as quoted in the article, maintained that, "'[t]his would create additional pressure to cut DRAM prices and build more wafer factories as joint ventures with local Chinese companies to spur the transfer of technology to China[.]'"

## Repurchases During the Relevant Period

115.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of over $2.2 billion to repurchase 51.6 million shares of its own common stock at artificially inflated prices from December 1, 2017 through November 29, 2018.

116.    As the Company stock was actually only worth $36.12 per share, the price at closing on November 20, 2018, the Company overpaid approximately $368.5 million in total for these repurchases.

117.    According to the Company's Form 10-Q filed with the SEC on March 23, 2018, between December 1, 2017 and January 4, 2018, the Individual Defendants caused the Company to repurchase 4,710,314 shares of its own common stock at an average price per share of approximately $45.68, for a total cost to the Company of approximately $215.1 million.

118.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $9.56 more than the actual worth of each share between December 1, 2017 and January 4, 2018. Thus, the total over payment by the Company for repurchases of its own stock between December 1, 2017 and January 4, 2018 was over $45 million.

119.    According to the Company's Form 10-Q filed with the SEC on March 23, 2018, between February 2, 2018 and March 1, 2018, the Individual Defendants caused the Company to repurchase 2,312,192 shares of its own common stock at an average price per share of approximately $42.47, for a total cost to the Company of approximately $98.1 million.

120.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $6.35 more than the actual worth of each share between February 2, 2018 and March 1, 2018. Thus, the total over payment by the Company for repurchases of its own stock between February 2, 2018 and March 1, 2018 was over $14.6 million.

121.    According to the Company's Form 10-Q filed with the SEC on June 22, 2018, between May 4, 2018 and May 31, 2018, the Individual Defendants caused the Company to

repurchase 2,185,755 shares of its own common stock at an average price per share of approximately $52.95, for a total cost to the Company of approximately $115.7 million.

122.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $16.83 more than the actual worth of each share between May 4, 2018 and May 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock between May 1, 2018 and May 31, 2018 was over $36.7 million.

123.    According to the Company's Form 10-Q filed with the SEC on December 18, 2018 between August 31, 2018 and October 4, 2018, the Individual Defendants caused the Company to repurchase 25,691,192 shares of its own common stock at an average price per share of approximately $43.39, for a total cost to the Company of approximately $1.1 billion.

124.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $7.27 more than the actual worth of each share between August 31, 2018 and October 4, 2018. Thus, the total over payment by the Company for repurchases of its own stock between August 31, 2018 and October 4, 2018 was over $186.7 million.

125.    According to the Company's Form 10-Q filed with the SEC on December 18, 2018, between October 5, 2018 and November 1, 2018, the Individual Defendants caused the Company to repurchase 11,494,319 shares of its own common stock at an average price per share of approximately $41.42, for a total cost to the Company of approximately $476 million.

126.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $5.30 more than the actual worth of each share between October 5, 2018 and

November 1, 2018. Thus, the total over payment by the Company for repurchases of its own stock between October 5, 2018 and November 1, 2018 was over $60.9 million.

127.     According to the Company's Form 10-Q filed with the SEC on December 18, 2018, between November 2, 2018 and November 29, 2018, the Individual Defendants caused the Company to repurchase 5,220,139 shares of its own common stock at an average price per share of approximately $40.78, for a total cost to the Company of approximately $212.8 million. Upon information and belief, at least some of these repurchases were made while the price of the Company's shares was artificially inflated due to the false and misleading statements discussed herein.

128.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.66 more than the actual worth of each share between November 2, 2018 and November 29, 2018. Thus, the total over payment by the Company for repurchases of its own stock between November 2, 2018 and November 29, 2018 was over $24.3 million.

129.     In total, the Company overpaid an aggregate amount of approximately $368.5 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

**Excessive Compensation**

130.     The Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

**DAMAGES TO MICRON**

131.    As a direct and proximate result of the Individual Defendants' conduct, Micron has lost and expended, and will lose and expend, many millions of dollars.

132.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions, and other lawsuits filed against the Company, its President and CEO, its CFO, and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

133.    Such expenditures include, but are not limited to, the cost of defending investigations of the Anti-Competitive Misconduct and for fines paid in connection thereto.

134.    Such losses include, but are not limited to, approximately $368.5 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

135.    Additionally, these expenditures include, but are not limited to, the excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company and whose compensation was excessive relative to compensation provided at comparable companies.

136.    As a direct and proximate result of the Individual Defendants' conduct, Micron has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

137.     Plaintiff brings this action derivatively and for the benefit of Micron to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Micron, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

138.     Micron is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Micron. Plaintiff will adequately and fairly represent the interests of Micron in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

140.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

141.     A pre-suit demand on the Board of Micron is futile and, therefore, excused. At the time of the filing of this action, the Board consists of the following seven individuals: Defendants Mehrotra, Bailey, Beyer, Byrne, and Switz (the "Director-Defendants"); and non-defendants Steve Gomo and Mary Pat McCarthy (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who were on the Board at the time this action was commenced.

142.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in the Anti-Competitive

Misconduct and the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $7.2 million, and while they caused the Company to repurchase 51.6 million shares of Company stock, overpaying approximately $368.5 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. That fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.   Additional reasons that demand on Defendant Mehrotra is futile follow. Defendant Mehrotra has served as the Company's President, CEO, and as a member of the Board since 2017. He also serves as a member of the Finance Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Mehrotra with his principal occupation, and he receives handsome compensation, including $14,241,583 during the fiscal year ended August 30, 2018. Defendant Mehrotra was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2017 and 2018 10-Ks which he signed, and the June 22, 2018 10-Q, all of which he signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive

Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Mehrotra is a defendant in the Securities Class Actions. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Mehrotra breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Bailey is futile follow. Defendant Bailey has served as a Company director since 2007 and serves as a member of the Audit Committee and Governance and Sustainability Committee. Defendant Bailey receives handsome compensation, including $373,214 during the fiscal year ended August 30, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bailey signed, and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least $1.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Bailey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Beyer is futile follow. Defendant Beyer has served as a Company director since 2013. He also serves as the Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee.  Defendant Beyer receives handsome compensation, including $375,633 during the fiscal year ended August 30, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Beyer signed, and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Beyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Byrne is futile follow. Defendant Byrne has served as a Company director since 2011 and serves as a member of the Compensation Committee and the Audit Committee. Defendant Byrne receives handsome compensation, including $373,214 during the fiscal year ended August 30, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Byrne signed, and thus personally made the false and misleading statements in, the

2017 and 2018 10-Ks. His insider sale before the fraud was exposed, which yielded at least $665,011 in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Byrne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Switz is futile follow. Defendant Switz has served as a Company director since 2006. He also serves as Chairman of the Board and as a member of the Compensation Committee and the Governance and Sustainability Committee. Defendant Switz receives handsome compensation, including $526,090 during the fiscal year ended August 30, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Switz signed, and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least $5.3 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Switz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on the Board is futile follow.

150.    As described above, three of the Director-Defendants directly engaged in insider trading, in violation of federal law. Director-Defendants Bailey, Byrne, and Switz collectively received proceeds of over $7.2 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

151.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Byrne is the President of Tektronix, which the Company paid approximately $2.6 million to for equipment and maintenance purchases made for the fiscal year ended August 30, 2018 through November 19, 2018. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

152.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

153.    Micron has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Micron any part of the damages Micron suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

154.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

155.    The acts complained of herein constitute violations of fiduciary duties owed by Micron officers and directors, and these acts are incapable of ratification.

156.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Micron. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Micron, there would be no directors' and officers' insurance protection. Accordingly,

the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is

futile and, therefore, excused.

157.    If there is no directors' and officers' liability insurance, then the Directors will not

cause Micron to sue the Individual Defendants named herein, since, if they did, they would face a

large uninsured individual liability. Accordingly, demand is futile in that event, as well.

158.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if

not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of

### Section 14(a) of the Exchange Act

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

160.    The Section 14(a) Exchange Act claims alleged herein are based solely on

negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf

of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud

claims.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

163.    Under the direction and watch of the Directors serving on the Board during the issuance of the 2017, and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls.

164.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "promote [the Company's] long-term success and shareholder value" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

165.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

166.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

167.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Mehrotra, Bailey, Beyer, Byrne, and Switz, which allowed them to continue breaching their fiduciary duties to Micron.

168.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

169.    Plaintiff on behalf of Micron has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of**

**Section 10(b) and Rule 10b-5 of the Exchange Act**

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Micron. Not only is Micron now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Micron by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over two billion dollars of its own shares on the open market at artificially-inflated prices, damaging Micron.

172.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

173.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Micron not misleading.

174.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated

by Micron. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

175.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

176.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

177.    Plaintiff on behalf of Micron has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of

### Section 20(a) of the Exchange Act

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    The Individual Defendants, by virtue of their positions with Micron and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Micron and each of its officers and directors who made the false and misleading statements alleged herein

within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Micron to engage in the illegal conduct and practices complained of herein.

180.    Plaintiff on behalf of Micron has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Micron's business and affairs.

183.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

184.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Micron.

185.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

186.    The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the Anti-Competitive Misconduct in violation of U.S. and Chinese law.

187.    The Individual Defendants further breached their fiduciary duties by causing themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

188.    In yet further breach of their fiduciary duties owed to Micron, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company engaged in the Anti-Competitive Misconduct; (2) the Anti-Competitive Misconduct would likely result in regulatory attention; (3) Micron's operating metrics were artificially enhanced due to the Anti-Competitive Misconduct; (4) as a result, the Company's revenue and general financial performance were inflated; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

189.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

190.    In breach of their fiduciary duties, nine of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $2.2 billion worth of Company stock at artificially inflated prices.

191.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

192.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

193.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Micron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.    Plaintiff on behalf of Micron has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Micron.

198.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Micron that was tied to the performance or artificially inflated valuation of Micron, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

199.    The Individual Defendants were also unjustly enriched by causing themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

200.    Plaintiff, as a shareholder and a representative of Micron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

201.    Plaintiff on behalf of Micron has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

204.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

205.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct, thereby wasting the Company's assets.

206.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

207.    Plaintiff on behalf of Micron has no adequate remedy at law.

## PRAYER FOR RELIEF

208.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Micron, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Micron;

(c)      Determining and awarding to Micron the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Micron and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Micron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Micron to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Micron restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 4, 2019                              Respectfully submitted,

Of Counsel:                                       **FARNAN LLP**

                                                  /s/ Michael J. Farnan
**THE BROWN LAW FIRM, P.C.**                      Brian E. Farnan (Bar No. 4089)
Timothy W. Brown                                  Michael J. Farnan (Bar No. 5165)
240 Townsend Square                               919 N. Market St., 12th Floor
Oyster Bay, NY 11771                              Wilmington, DE 19801
Telephone: (516) 922-5427                         Telephone: (302) 777-0300
Facsimile: (516) 344-6204                         Facsimile: (302) 777-0301
Email: tbrown@thebrownlawfirm.net                 Email: bfarnan@farnanlaw.com
                                                  Email: mfarnan@farnanlaw.com

                                                  *Attorneys for Plaintiff*